# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# BRUNSWICK DIVISION

AQUILLA TERRELL RANDOLPH,

        Movant,

    v.

UNITED STATES OF AMERICA,[1]

        Respondent.

CIVIL ACTION NO.: 2:16-cv-12

(Case No.: 2:14-cr-32)

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On August 25, 2015, this Court sentenced Aquilla Terrell Randolph ("Randolph") to sixty-eight months' imprisonment after he pleaded guilty to the crimes of conspiracy and aggravated identify theft.  Randolph, who is currently incarcerated at the Federal Prison Camp in Atlanta, Georgia, filed a Motion to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255.  (Doc. 117.)[2]  Randolph contends that various errors by his trial counsel plagued his guilty plea and sentence.  As laid out below, Randolph's far-reaching claims lack merit.  Randolph's conviction and sentence resulted from his own admitted criminal conduct, not any errors by his counsel.  Thus, for the reasons which follow, I **RECOMMEND** the Court **DENY** Randolph's Motion to Vacate, Set Aside, or Correct his Sentence.  Further, I **RECOMMEND**

---

[1]  The United States of America is the only proper respondent in a collateral attack made pursuant to Section 2255.  Lee v. United States, 501 F.2d 494, 502 (8th Cir. 1974); see 28 U.S.C. § 2255(a) (motions are directed to the sentencing court).  Therefore, the Court **DIRECTS** the Clerk of Court to amend the caption of this case to name the United States of America as the proper Respondent.

[2]  The pertinent record documents in this case are filed on the docket of Randolph's criminal case, United States v. Randolph, 2:14-cr-32 (S.D. Ga. Aug. 25, 2015), and many are not included in Randolph's civil docket.  Thus, for ease of reference and consistency, the Court cites to Randolph's criminal docket in this Order and Report and Recommendation.

that the Court **DENY** Randolph a Certificate of Appealability and *in forma pauperis* status on appeal. The Court should **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal.[3]

## BACKGROUND

On November 6, 2014, the grand jury for this District returned a thirty-count Indictment against Randolph. (Doc. 1.) The Indictment arose out of a scheme to create and submit false tax returns in order to obtain fraudulent refunds. (Id.) The grand jury charged Randolph with wire fraud in violation of 18 U.S.C. § 1343 (Counts One through Ten); False Claims in violation of 18 U.S.C. § 287 (Counts Eleven through Twenty); and Aggravated Identify Theft in violation of 18 U.S.C. § 1028A(a)(1) (Counts Twenty-One through Thirty). (Id.) The Government asserted in its Penalty Certification that Randolph faced not more than twenty years' imprisonment as to each of Counts One through Ten; not more than five years' imprisonment as to each of Counts Eleven through Twenty; and two years' consecutive imprisonment as to each of Counts Twenty-One through Thirty. (Doc. 2.)

On March 4, 2015, the grand jury returned a Superseding Indictment against Randolph and codefendant Edward C. Jennings. (Doc. 43.) The Superseding Indictment charged Randolph and Jennings with a conspiracy to commit wire fraud, theft of public funds, and

---

[3] Randolph is not entitled to an evidentiary hearing. Randolph has the burden of establishing the need for an evidentiary hearing. Birt v. Montgomery, 725 F.2d 587, 591 (11th Cir. 1984). He would be entitled to a hearing only if his allegations, if proved, would establish his right to collateral relief. Townsend v. Sain, 372 U.S. 293, 307 (1963). "Under Rules Governing Section 2255 Cases, Rule 4(b), a district court faced with a 2255 motion may make an order for its summary dismissal "[i]f it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief[.]" Broadwater v. United States, 292 F.3d 1302, 1303 (11th Cir. 2002). Accordingly, no hearing is required when the record establishes that a Section 2255 claim lacks merit. United States v. Lagrone, 727 F.2d 1037, 1038 (11th Cir. 1984). Additionally, the Court need not hold a hearing where the record reveals the claim is defaulted. McCleskey v. Zant, 499 U.S. 467, 494 (1991). Randolph has not established any basis for an evidentiary hearing because the record reveals that all of the issues he raises either lack merit or are procedurally defaulted, waived, or barred.

aggravated identify theft in violation of 18 U.S.C. § 371, (Count One). (Id.) The grand jury also alleged that Randolph committed the crimes of wire fraud (Counts Two through Eleven); aggravated identify theft (Counts Twelve through Twenty-One and Counts Thirty-Two through Forty-One); and theft of public money (Counts Twenty-Two through Thirty-One). (Id.) The Penalty Certification as to the Superseding Indictment stated that Randolph faced not more than five years' imprisonment as to the conspiracy charge; not more than twenty years' imprisonment as to each of the wire fraud charges; not more than ten years' imprisonment as to each of the theft of public money charges; and two years' consecutive imprisonment as to each of the aggravated identify theft charges. (Doc. 44.)

The Court placed Randolph on pretrial release at the beginning of the case, and he remained on pretrial release following the Superseding Indictment. (Doc. 13.) The Court ordered that while Randolph was on pretrial release he "must not violate federal, state, or local law" and that he "shall not maintain any position of trust or position with access to personal identifiers" and "may not prepare any tax returns or act as a tax advisor." (Id. at pp. 1–2.) The Government filed a Motion for Revocation of Randolph's Bond alleging that Randolph violated these conditions. (Doc. 67.) On April 7, 2015, the Court held a hearing on that Motion and found that Randolph had indeed violated the terms of his pretrial release. (Doc. 70.) In its April 9, 2015 Order granting the Government's Motion for Revocation, the Court stated:

> At the hearing on the instant Motion, the Government presented several witnesses who provided clear and convincing evidence that Defendant had violated the terms of his release. (See generally Doc. 70.) These witnesses detailed that Defendant had continued to operate a tax preparation business after his release on bond. Several witnesses testified that they had given Defendant their financial records with personal-identifying information in the calendar year 2015 to prepare tax returns for income they had earned in 2014. These witnesses testified that they had paid Defendant for tax preparation services and that Defendant had provided such services and given the individuals tax preparation advice. At least one witness testified that Defendant had included false information on the witness's

tax return, including information regarding itemized deductions that had no factual basis.

(Doc. 73, p. 2.) The Court held that Randolph "not only failed to abide by the Order Setting the Conditions of Release, he willfully and repeatedly violated that Order. Defendant's blatant disregard for the conditions of his release cannot be excused or explained away." (Id. at p. 3.)

Subsequently, Randolph and his appointed attorney, Mr. Joseph L. Phelps, III, were able to negotiate a plea agreement with the Government whereby Randolph agreed to plead guilty to Counts One and Thirty-Two of the Indictment. (Doc. 88.) He also agreed to waive his rights to appeal and collaterally attack his sentence with limited exceptions. (Id. at p. 7.) In exchange, the Government agreed to dismiss the remaining counts of the Indictment. (Id.) The plea agreement laid out Randolph's offense conduct and the factual basis for his guilty plea. (Id. at pp. 1–4.) Randolph and the Government agreed that the amount of loss for purposes of Randolph's Guidelines calculation was greater than $200,000 but less than $400,000. (Id. at p. 6.) Through the plea agreement, Randolph agreed that he "has had the benefit of legal counsel in negotiating this agreement. Defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice given and the work performed by his attorney." (Id. at p. 9.)

On April 28, 2015, Randolph appeared before the Honorable Lisa Godbey Wood for a change of plea, or Rule 11, proceeding. (Doc. 114.) At the hearing, Judge Wood engaged in an extensive plea colloquy with Randolph. She explained to Randolph that the decision to plead guilty was an important one, that the decision was entirely his decision, and that she wanted to be certain that Randolph understood all of the important considerations that go into the decision. (Id. at pp. 2–3.) Judge Wood inquired whether anyone was making, forcing, or leaning on

4

Randolph to plead guilty, and he said no one had done so and that pleading guilty was what he wanted to do.  (<u>Id.</u> at p. 3.)

Judge Wood had Randolph placed under oath before asking him a series of questions. (<u>Id.</u>)  He was able to recount his personal information, including his age, the ages of his children, and his residence.  (<u>Id.</u> at p. 4.)  Randolph testified that he obtained his high school diploma.  (<u>Id.</u> at pp. 4–5.)  Randolph recounted his employment history including working as a general manager, supervisor, and corporate trainer for a restaurant chain, opening his own fish market, and operating a tax preparation business.  (<u>Id.</u> at p. 5.)  Randolph stated that his only physical or mental injury or disability was a back condition and that the medication he took for that condition did not interfere with his ability to communicate and strategize with his attorney or participate in the hearing.  (<u>Id.</u> at pp. 5–6.)

Judge Wood explained to Randolph that he was presumed innocent and the Indictment was not evidence of his guilt.  (<u>Id.</u> at pp. 6–7.)  She also explained that he did not have to plead guilty and that he had the right to maintain a plea of not guilty.  (<u>Id.</u> at p. 7.)  Judge Wood further advised Randolph that if he chose to persist in his not guilty plea, he would have the right to a public and speedy trial by jury, a presumption of innocence during that trial, and the assistance of counsel through every phase of the case.  (<u>Id.</u> at pp. 7–8.)  Judge Wood told Randolph that if he went to trial he could see, hear, confront, and cross-examine the Government's witnesses and evidence, call witnesses on his behalf, and testify himself or remain silent.  (<u>Id.</u>)  Judge Wood cautioned Randolph he would be waiving these rights if he pleaded guilty.  (<u>Id.</u> at pp. 8–9.)  She explained that, if she accepted his guilty plea, there would be no right to trial of any kind, and that all that would remain of his case would be the sentencing phase.  (<u>Id.</u>)  Randolph stated that

he understood and that he had no questions regarding the waiver of his rights. (Id. at p. 9.) He volunteered, "my attorney went over that with me." (Id.)

Randolph also stated he and Mr. Phelps reviewed the Indictment together; that he had the opportunity to talk to Mr. Phelps about the facts and law of his case; and that he and Mr. Phelps had discussed the proposed plea agreement. (Id.) Randolph testified that he was satisfied with Mr. Phelps' representation and that he had no complaints about Mr. Phelps whatsoever. (Id. at pp. 9–10.)

Judge Wood reviewed Counts One and Thirty-Two of the Indictment with Randolph and discussed the essential elements of the crimes for which he was charged and what the Government would have to prove if he went to trial. (Id. at pp. 10–13.) Randolph responded that he understood what he was charged with, what the elements of the offenses were, and what the Government would have to prove if he went to trial. (Id.) He understood that by pleading guilty he would admit that the elements are satisfied. (Id. at p. 13.) Judge Wood advised Randolph of the penalties she could impose on the Counts to which he was pleading guilty. (Id. at pp. 13–14.) She specifically explained that Count Thirty-Two carries a mandatory minimum of two years' imprisonment consecutive to any sentence on Count One. Randolph responded that he understood. (Id. at p. 14.) Moreover, Judge Wood explained to Randolph that, in imposing a sentence upon him, she would have to take into consideration the advisory Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553, and she outlined the factors she would consider at sentencing. (Id. at p. 15.) Judge Wood asked Randolph if he had any questions about sentencing, and he responded that he did not. (Id.) Randolph testified that no one had promised him an exact sentence. (Id. at p. 16.) Judge Wood explained that all that

anyone could give him is a "best guess" or "estimate" of what his Guidelines' range would be, and that such an estimate would in no way bind the Court. (Id.)

Judge Wood affirmed with Randolph that he had given Mr. Phelps permission to negotiate a plea agreement with the Government. (Id.) She then asked the Assistant United States Attorney ("AUSA") to summarize the provisions of the plea agreement. AUSA Shane Mayes stated:

> In summary, the plea agreement provides that upon Mr. Randolph pleading guilty to Counts 1 and 32 of the indictment, the Government will move to dismiss the remaining counts of the indictment.
>
> In doing so, Mr. Randolph admits the accuracy of the factual basis as stated on Page 2 through 4 -- Pages 2 through 4 of the plea agreement. The Government and Mr. Randolph agree to recommend to the US Probation Office and The Court at sentencing that for purposes of Section 2B1.1 of the sentencing guidelines the amount of loss is greater than 200,000.00 but less than 400,000.00.
>
> Mr. Randolph agrees to pay restitution for the full loss caused by his total criminal conduct which is not limited to the specific counts to which he is pleading guilty.
>
> At sentencing, as stated earlier, the Government will move to dismiss any other counts of the indictment. Defendant waives all rights to request information pursuant to the Freedom of Information Act or the Privacy Act.
>
> Defendant waives the protection of Rule 11(f) of the Federal Rules of Criminal Procedure or Rule 14 of the Federal Rules of Evidence.
>
> If Mr. Randolph fails to plead guilty or later withdraws his guilty plea, all statements made by him in connection with the plea and any leads derived therefrom shall be admissible for any and all purposes.
>
> Your Honor, the plea agreement contains the Government's standard appellate waivers and those appear on Page 7 . . . .

(Id. at pp. 17–18.) AUSA Mayes then confirmed with Randolph that his signature was on the plea agreement presented by the Government. (Id. at p. 18.) Judge Wood asked Randolph if AUSA Mayes's summarization of the plea agreement was consistent with the plea agreement he

signed, and Randolph stated it was. (Id. at p. 19.) Randolph also stated he read the plea agreement, and Mr. Phelps answered any questions Randolph had before Randolph signed the agreement. (Id.) Randolph reaffirmed that no one had made him any promises regarding the outcome of his case other than the provisions contained in the plea agreement. (Id.)

Judge Wood then specifically addressed the direct appeal waiver with Randolph, stating the following:

> I want to follow up on something that Mr. Mayes mentioned and that is as a part of this plea agreement that you're urging, it does contain a waiver of certain appellate rights.
>
> It states "Defendant entirely waives his right to a direct appeal of his conviction and sentence on any ground." There are, however, three exceptions to that waiver of your appellate rights. That is, you are allowed to directly appeal only if one of these three things were to occur.
>
> Number 1, if I were to sentence you above the statutory maximum, then you would be able to appeal that directly. Number 2, if I were to sentence you above the advisory guideline range as found by me, then you could appeal that directly, or Number 3, if the Government were to file a direct appeal, then you, too, could file one.
>
> But other than those three occurrences, by virtue of this plea agreement, you waive all other direct appellate rights; do you understand?

(Id. at pp. 19–20.) Randolph stated he understood the appeal waiver provision. (Id. at p. 20.)

Judge Wood also explained that the proposed plea agreement contained a waiver of certain of Randolph's collateral attack rights. She explained:

> The agreement also contains a waiver of your collateral attack rights. It states "Defendant entirely waives his right to collaterally attack his conviction and sentence on any ground and by method including but not limited to a 28 USC Section 2255 motion," and the only exception to that waiver is that you do retain the right to collaterally attack based on ineffective assistance of counsel. Do you understand?

(Id.) Randolph replied that he understood the collateral attack waiver provision and that he did not have any questions about the waivers. (Id.)

Judge Wood asked Mr. Phelps and AUSA Mayes whether they were aware of any impropriety on the part of the Government in handling Randolph's case, and they both responded in the negative. (Id.) Judge Wood then asked Randolph whether he wished to still plead guilty to Counts One and Thirty-Two of the Indictment because he was in fact guilty of those Counts, and Randolph answered in the affirmative. (Id. at p. 21.) Judge Wood also asked Randolph whether he understood the rights and privileges he was waiving if she accepted his plea, and he said he did. (Id.)

Judge Wood observed that, "[i]t's obvious that [Randolph is] in full possession of all his faculties. He's participated knowingly and intelligently today." (Id.) She further stated, "[h]e has had the services of a very good defense attorney who has gone over all the requisite documentation with him. They have discussed the facts and the law. He's pleased with his defense attorney thus far." (Id.) Judge Wood determined that Randolph offered to plead guilty "knowingly and voluntarily." (Id. at p. 22.) Randolph responded in agreement with Judge Wood's conclusion. (Id.)

Jason Edward Dulin, a special agent with the Internal Revenue Service's ("IRS") Criminal Division, provided the Government's factual basis for the plea. (Id. at pp. 22–24.) Dulin testified that the IRS received information that Randolph was preparing fraudulent tax returns using stolen identities. (Id. at p. 23.) The resulting investigation revealed that for approximately two years Randolph and others were carrying out an "illegal tax fraud scheme" in Wayne County, Georgia. (Id.) Agent Dulin testified that Randolph unlawfully obtained other individuals' identifications, used those identifications to submit fraudulent tax returns, and then cashed the refund checks that resulted from the fraudulent returns. (Id.) Dulin detailed the criminal conduct forming the basis of Count Thirty-Two of the Superseding Indictment, a

fraudulent tax return in the name of Zach Spaulding.  (Id. at pp. 23–24.)  In 2011, Mr. Spaulding's stolen identifying information was used to submit a fraudulent tax return from an IP address registered to Mr. Randolph.  (Id.)  Mr. Randolph and another individual cashed the tax refund check at a store in Jesup, Georgia, by falsely representing that the other individual was Mr. Spaulding.  (Id.)  Randolph signed the fraudulent refund check as a second endorser.  (Id.)  Upon questioning from Judge Wood, Randolph testified that he did not dispute any of the testimony given by Agent Dulin, and he admitted to the truth of Agent Dulin's testimony.  (Id. at p. 24.)

Judge Wood found that there was a factual basis for the plea of guilty, accepted Randolph's plea, and adjudged him guilty of Counts One and Thirty-Tow of the Superseding Indictment.  (Id. at pp. 24–25.)  Judge Wood advised Randolph that the United States Probation Office would prepare a Pre-Sentence Investigation Report ("PSI"), and the Court would schedule a sentencing hearing after the PSI was disclosed to the Government and the Defense.  (Id.)  Mr. Phelps then made a motion to have Randolph's bond reinstated and that he be released pending his sentencing hearing.  (Id. at pp. 25–26.)  The Government opposed that Motion, and Judge Wood denied it and remanded Randolph to the custody of the United States Marshal.  (Id.)

Prior to Randolph' sentencing hearing, United States Probation Officer Scott Riggs prepared a PSI.  Probation Officer Riggs detailed Randolph's offense conduct and criminal history and calculated Randolph's advisory Guidelines' range.  (Doc. 116.)  The PSI detailed Randolph's operation of a fraudulent income tax scheme.  (Id. at ¶¶ 7–19.)  Officer Riggs determined that for the purposes of the Sentencing Guidelines, Randolph should be attributed with an intended loss of $320,496.  (Id. at ¶ 19.)

Under U.S.S.G. §§ 2X1.1(a) and 2B1.1(a)(2), Randolph's base offense level for Count One, the conspiracy offense, was 6.  (Id. at ¶ 28.)    However, Randolph's offense level was increased by 12 levels under U.S.S.G. § 2B1.1(b)(1)(G)  because the intended loss amount was more than $200,00 but less than $400,000, and by two levels under U.S.S.G. § 2B1.1(b)(2)(A) because the offense involved  more than ten victims.  (Id. at ¶¶ 29, 30.)  Riggs concluded that though Randolph admitted that he participated in the unlawful conspiracy, Randolph's offense level should not be reduced for acceptance of responsibility because he violated the conditions of his bond and failed to withdraw from criminal conduct while on pretrial release.  (Id. at ¶ 23.)  Thus, his total offense level as to Count One was 20.  (Id. ¶ 37.)  The twenty-four month term of conviction for Count 32, aggravated identify theft, was provided by statute and not the Guidelines.  (Id. at ¶ 38.)  Though Randolph had a number of prior arrests, he only obtained two criminal history points for a Guidelines criminal history category of II.  (Id. at ¶ 47.)

According to the PSI, with an offense level of 20 and Criminal history category of II, Randolph's Guidelines' range for imprisonment as to Count One was 37 months to 46 months.  (Id. at ¶ 76.)  Probation Officer Riggs stated that Randolph's statutory maximum term of imprisonment as to Count One was five years.  (Id. at ¶ 74.)  As to Count Thirty-Two, the required term of imprisonment was two years to be served consecutive to any sentence on Count One.  (Id. at ¶¶ 74, 75.)

Mr. Phelps objected to the PSI and argued that Randolph should be given a two-level reduction in his offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.  (Id. at p. 21.)  Phelps argued that Randolph's truthful admission to the probation officer warranted the reduction.  (Id. at pp. 21–23.)  Probation Officer Riggs opposed this objection and stated that the adjustment was not warranted because Randolph failed to withdraw from criminal conduct

while on pretrial release. (Id.) Specifically, he detailed Randolph's conduct that led to the revocation of his pretrial release including preparing fraudulent tax returns. (Id.)

Prior to Randolph's sentencing hearing, Phelps filed a Sentencing Memorandum on Randolph's behalf. (Doc. 96.) Therein, Phelps reasserted his Objection to Officer Riggs' conclusion that Randolph should not receive an adjustment for acceptance of responsibility. (Id. at p. 1.) Phelps also moved for a downward departure based on five reasons: (1) Randolph's lack of a felony conviction; (2) his need to work in order to pay restitution; (3) his cooperation with authorities; (4) his need to continue his role as a supportive father; and (5) his prior good works in the community. (Id. at pp. 1–5.)

Randolph appeared before Judge Wood for a sentencing hearing on August 25, 2015. (Doc. 101.) At that hearing, Judge Wood heard from Randolph, Randolph's counsel, counsel for the Government, and four witnesses. (Doc. 110.) The hearing began by Judge Wood asking Randolph if he had an opportunity to read the PSI and discuss it with Mr. Phelps. (Id. at pp. 3–4.) Mr. Randolph responded that he had. (Id. at p. 4.) Mr. Phelps then confirmed that there were no objections to the factual accuracy of the PSI but that Randolph did object to the Probation Officer not recommending a two-level reduction for acceptance of responsibility. (Id.) After hearing from Mr. Phelps and AUSA Scarlett Nokes, Judge Wood overruled the objection. (Id.at pp. 5–7.) In concurrence with the PSI, Judge Wood determined that as to Count One, Randolph's offense level was twenty, and his criminal history category was II resulting in a Guidelines' range of 37 to 46 months' imprisonment. (Id. at p. 7.) Additionally, Judge Wood determined that a consecutive sentence of two years' imprisonment was required as to Count Thirty-Two. (Id.)

Judge Wood then turned to Mr. Phelps for any evidence or argument in mitigation of the sentence. (Id. at 7.) Mr. Phelps responded that, as laid out in the memorandum, he had five reasons that he and Randolph believe the Court should depart below the Guidelines and that he had evidence that he would like to present to back up those arguments. (Id. at pp. 7–8.) Mr. Phelps then called Erica James, Randolph's fiancée of seventeen years to testify. (Id. at p. 8.) Ms. James testified that Randolph is an active and supportive father to their children and that he coaches their sports teams. (Id. at pp. 8–10.) Upon questioning from Mr. Phelps, Ms. James also recounted the difficulties that she and her children have encountered due to his detention during the case and asked for the Court's leniency towards Randolph. (Id. at pp. 10–12.) Ms. James presented photographs depicting work that Randolph performed in the community. (Id. at p. 13.)

Mr. Phelps then called Filton Johnson, Randolph's pastor and uncle to testify. (Id. at p. 14.) Upon questioning from Mr. Phelps, Reverend Johnson testified to Randolph's work history, his activities with his children, and in his church involvement, and he asked for the Court's leniency. (Id. at pp. 15–16.) Judge Wood asked whether Reverend Johnson was aware of the fraudulent income taxes that Randolph had submitted, and Johnson testified that he was not and that he only found out about the case after returning from being out of state for several months. (Id. at p. 16.)

Mr. Phelps next called Mary James, Randolph's fiancée's mother, to the witness stand. (Id. at p. 17.) Ms. Mary James testified to the support that Randolph has provided to his fiancée, their children, and to her personally. (Id. at pp. 17–18.) She also detailed the negative effect his detention has had on the family, and she asked the Court for leniency so that he can be with his children. (Id. at p. 19.) Judge Wood then asked whether Mary James was aware that Randolph had been convicted of battery as to her daughter, and Mary James responded that she was not.

(Id. at p. 20.)  AUSA Nokes then cross-examined Mary James on an incident that occurred in September of 2012.  (Id. at pp. 21–22.)  Mary James testified that Randolph and Erica James got into a fight one day while she was present.  (Id.)  Though her recollection was spotty, there was some inference that Randolph fired a pistol during the incident.  (Id.)  Mr. Phelps then asked Mary James on redirect whether she was aware that Randolph called the police on the day in question.  (Id. at p. 23.)

Lastly, Mr. Phelps called Jerry Byers to testify.  (Id.)  Mr. Byers testified that he had known Randolph for approximately fifteen years.  (Id. at p. 24.)  He recounted Randolph's interaction with his children and the difficulty his absence has had on them.  (Id. at pp. 24–25.) He also testified about Randolph's personal support of Byers in times of difficulty.  (Id. at p. 25.) Drawing on Byers' own military experience as well as Randolph's support of his community and his family, Byers asked the Court to give Randolph a "second chance."  (Id. at pp. 25–26.) Phelps also introduced letters on Randolph's behalf.  (Id. at p. 28.)

Mr. Phelps then offered argument in mitigation of the sentence.  (Id. at pp. 28–29.)  He echoed the five reasons from his sentencing memorandum and asked the Court to depart below the Guidelines range.  (Id.)  AUSA Nokes then addressed the Court and argued that Randolph should receive a sentence within the Guidelines range.  (Id. at pp. 30–31.)  Lastly, Randolph addressed the Court with a lengthy allocution and requested leniency and to be allowed to self-surrender.  (Id. at pp. 31–36.)  Among other things, he apologized for his misdeeds, and he recounted the difficulties that his children have endured and his work with his church.  (Id. at pp. 31–33.)  Randolph acknowledged that he "mess[ed] up on [his] bond," and he addressed the family violence incidents recounted in his PSI and discussed earlier in the hearing.  (Id. at pp.

33–34.)  He also touted his assistance to others including his work with youth sports teams.  (Id. at pp. 34–36.)

Judge Wood then stated that she had listened to all of the information that had been presented, including the PSI, the testimony, the letters presented, and Mr. Phelps' arguments. (Id. at p. 36.)  She explained that she had thought deeply about how the federal sentencing statute and its factors apply to Randolph's case.  (Id.)  Judge Wood explained that she had to consider both the good and the bad "sides of the scale" when reviewing Randolph's history and that "Mr. Phelps has done a good job of bringing forth members of your family and your community and eliciting from you statements about the good side, and that's important in the sentencing."  (Id. at p. 37.)  Judge Wood found that "[i]n this case, in weighing both sides of the scale, it is apparent that the sentencing commission has struck the right balance as far as the advisory guidelines calculation goes."  Based on all of the information and consideration of the Section 3553 factors, Judge Wood pronounced a sentence of 68 months' imprisonment, consisting of forty-four months as to Count One (within the Guidelines range), and twenty-four months as to Count Thirty-Two (the sentence required by statute).  (Id. at pp. 38–39.)  She ordered restitution in the amount of $283,486.52.  (Id. at p. 39.)  Judge Wood explained that she found no reason to depart downward from the advisory Guidelines' range.  (Id.)  Judge Wood advised Randolph that he waived his right to appeal with limited exceptions, pursuant to his plea agreement, but advised Mr. Phelps to review the notice of post-conviction obligation with Randolph.  (Id. at pp. 42–43.) Pursuant to the plea agreement, Judge Wood dismissed the other charges of the Superseding Indictment pending against Randolph.  (Id. at p. 42.)

On August 31, 2015, Mr. Phelps filed a Notice of Appeal to the Eleventh Circuit Court of Appeal on Randolph's behalf.  (Doc. 103.)  While that appeal was still pending, Randolph filed

the instance Section 2255 Motion *pro se*. (Doc. 117.) This Court stayed the Section 2255 Motion during the pendency of the direct appeal. (Doc. 120.) On April 12, 2016, the Eleventh Circuit granted Randolph's motion to dismiss his direct appeal. (Doc. 122.) The Government subsequently responded in opposition to Randolph's Section 2255 Motion, (doc. 127), and Randolph filed a Reply, (doc. 128).

## DISCUSSION

Construing Randolph's Section 2255 Motion liberally, he contends that Mr. Phelps rendered ineffective assistance of counsel in four areas: (1) prior to Randolph pleading guilty, Mr. Phelps failed to investigate the evidence surrounding Randolph's case and misadvised him regarding his prospects at trial, (doc. 117, p. 2);[4] (2) at sentencing, Mr. Phelps failed to introduce two affidavits and audio tape that Randolph contends are exculpating evidence, (id. at pp. 3–5); (3) at sentencing, Mr. Phelps failed to argue and introduce evidence that Randolph accepted responsibility for his crimes, (id. at p. 5); (4) at sentencing, Mr. Phelps failed to call character witnesses and called witnesses that were relatives with whom Randolph had a domestic dispute, (id. at pp. 5–6).

Criminal defendants have a right to effective assistance of counsel at all critical stages of the proceedings. Strickland v. Washington, 466 U.S. 668 (1984). This right extends to the entry of a guilty plea, Hill v. Lockhart, 474 U.S. 52, 58 (1985), and during sentencing proceedings, Glover v. United States, 531 U.S. 198, 202 (2001). A defendant's guilty plea, appeal waiver, or collateral attack waiver does not preclude an ineffective assistance of counsel claim premised on

---

[4] Randolph does not label this argument as an independent claim in his Motion. However, in the Background section of his Motion, he states, "[g]iving [sic] all the evidence, if Mr. Phelps had investigated all the evidence, I would not have entered into a plea and insisted on going to trial." (Doc. 117, p. 2.) Thus, giving Randolph the benefit of the doubt, the Court will assess this claim.

an involuntary and unintelligent plea. <u>United States v. Puentes-Hurtado</u>, 794 F.3d 1278, 1281, 1285 (11th Cir. 2005).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." <u>Strickland</u>, 466 U.S. at 686. A convicted defendant must meet two components to establish that counsel's assistance was so defective as to require reversal of a conviction or sentence: (1) his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness, and (2) he suffered prejudice as a result of that deficient performance. <u>Id.</u> at 685–86. "If a petitioner cannot satisfy one prong, we need not review the other prong." <u>Duhart v. United States</u>, 556 F. App'x 897, 898 (11th Cir. 2014). Thus, if a defendant cannot show prejudice, the Court need not determine whether defendant's allegations show his counsel's performance fell below an objective standard of reasonableness.

The deficient performance requirement concerns "whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." <u>Hill</u>, 474 U.S. at 56. There is a strong presumption that counsel's conduct fell within the range of reasonable professional assistance. <u>Davis v. United States</u>, 404 F. App'x 336, 337 (11th Cir. 2010) (citing <u>Strickland</u>, 466 U.S. at 686). "It is petitioner's burden to 'establish that counsel preformed outside the wide range of reasonable professional assistance' by making 'errors so serious that [counsel] failed to function as the kind of counsel guaranteed by the Sixth Amendment.'" <u>LeCroy v. United States</u>, 739 F.3d 1297, 1312 (11th Cir. 2014) (quoting <u>Butcher v. United States</u>, 368 F.3d 1290, 1293 (11th Cir. 2004) (second alteration in original)). "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the

particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690.

Further, retrospective judicial scrutiny of counsel's performance "must be highly deferential"

and must "eliminate the distorting effects of hindsight." Id. at 689. "In evaluating performance,

'counsel is strongly presumed to have rendered adequate assistance and made all significant

decisions in the exercise of reasonable professional judgment.'" LeCroy, 739 F.3d at 1312

(quoting Strickland, 466 U.S. at 690). "[B]ecause counsel's conduct is presumed reasonable, for

a petitioner to show that the conduct was unreasonable, a petitioner must establish that no

competent counsel would have taken the action that his counsel did take." Chandler v. United

States, 218 F.3d 1305, 1315 (11th Cir. 2000).

Even if counsel made an error so egregious as to be outside the broad scope of

competence expected of attorneys, a movant can obtain relief only if the error caused actual

prejudice. Strickland, 466 U.S. at 691–92. "Showing prejudice requires petitioner to establish a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." LeCroy, 739 F.3d at 1312 (internal citation omitted). "The

prejudice prong requires a petitioner to demonstrate that seriously deficient performance of his

attorney prejudiced the defense." Id. at 1312–13. "The likelihood of a different result must be

substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011). A reasonable

probability of a different result "is a probability sufficient to undermine confidence in the

outcome." Strickland, 466 U.S. at 694.

A movant is not entitled to habeas relief "when his claims are merely conclusory

allegations unsupported by specifics or contentions that in the face of the record are wholly

incredible." Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991). "The allegations must be

factual and specific, not conclusory. Conclusory allegations are simply not enough to warrant a

hearing." Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011) (citing San Martin v. McNeil, 633 F.3d 1257, 1271 (11th Cir. 2011)). For a movant proceeding *pro se*, the court will liberally construe the pleading, but he or she "must suggest (even if inartfully) that there is at least some factual support for a claim; it is not enough just to invoke a legal theory devoid of any factual basis." Jones v. Fla. Parole Comm'n, 787 F.3d 1105, 1107 (11th Cir. 2015). "An evidentiary hearing may be necessary where the material facts are in dispute, but a [movant] is not entitled to an evidentiary hearing when his claims are merely conclusory allegations unsupported by specifics." Pugh v. Smith, 465 F.3d 1295, 1300 (11th Cir. 2006) (citations omitted). Stated another way, "if a habeas petition does not allege enough specific facts, that if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing." Chavez, 647 F.3d at 1060 (citing Allen v. Sec'y Fla. Dep't of Corr., 611 F.3d 740, 763 (11th Cir. 2010)).

Further, because solemn representations at a plea hearing by a defendant, his attorney, and the prosecutor "carry a strong presumption of verity" and "constitute a formidable barrier in subsequent collateral proceedings," a movant's later "presentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . . ." Blackledge v. Allison, 431 U.S. 63, 73–74 (1977) (citing Machibroda v. United States, 368 U.S. 487, 495–96 (1962), and Price v. Johnston, 334 U.S. 266, 286–87 (1948)). "[I]f the Rule 11 plea-taking procedure is careful and detailed, the defendant will not later be heard to contend that he swore falsely." United States v. Stitzer, 785 F.2d 1506, 1514 n.4 (11th Cir. 1986). The statements of a defendant in open court are presumed to be true. See Gonzalez-Mercado, 808 F.2d at 800 n.8. Thus, "[o]nly in the most extraordinary circumstances" will an evidentiary hearing be required to dispose of the later

contention that statements made during the change of plea were untruthful." Blackledge, 431 U.S. at 80 n.19.

Here, Randolph relies upon wholly conclusory allegations as support for his claims that Mr. Phelps rendered ineffective assistance. He fails to make factual and specific allegations and largely invokes legal theories without connecting those theories to the actual facts of his case. Furthermore, these allegations contradict the sworn statements Randolph made during his Rule 11 hearing. The Court could dispose of his claims without in-depth analysis due to Randolph's conclusory pleadings. However, the analysis below demonstrates that, even construing Randolph's pleadings liberally, he is not entitled to relief.

## I.    Mr. Phelps' Assistance Prior to Randolph's Guilty Plea

Randolph claims that Mr. Phelps misadvised him as to his chances of succeeding at trial and induced him to plead guilty based on the faulty legal advice. (Doc. 117, p. 2) Randolph alleges that he was "hopeless" and "coerced by intimidation" to plead guilty, and that but for these errors, he would have "insisted on going to trial." (Id.)

Randolph's "knowing and voluntary guilty plea waive[d] all non-jurisdictional, pre-plea defects, including ineffective assistance of counsel with respect to issues not implicating the voluntariness of the plea." Wilson v. United States, 962 F.2d 996, 997 (11th Cir. 1992). Given the "careful and detailed" procedure that Judge Wood employed at the plea hearing, Randolph cannot now be heard to contradict his own sworn statements at that hearing. Stitzer, 785 F.2d at 1514 n.4.

As laid out above, during the Rule 11 hearing, Judge Wood went to great lengths to make certain that Randolph's plea was knowingly, voluntarily, and intelligently made. (Doc. 114.) Randolph stated that no one was forcing him, leaning on him, or making him plead guilty, and

that he wanted to plead guilty. (<u>Id.</u> at p. 3.) Among other things, Judge Wood apprised Randolph of the rights that he would waive if he pleaded guilty, the elements of the crimes with which he was charged, the penalties that he faced, and the federal sentencing scheme. Throughout the plea hearing, Randolph was able to converse with the Court, recount personal information, and respond to all of the Court's questions. (<u>Id.</u> at pp. 1–24.) Having carefully observed and questioned Randolph at length, Judge Wood found that Randolph was "in full possession of all of his faculties," that he "understands the nature of the charges that are lodged against him" and "the consequences of his plea." (<u>Id.</u> at pp. 21–22.) Judge Wood concluded that Randolph knowingly and voluntarily decided to plead guilty, and Randolph testified under oath that he agreed with her assessment. (<u>Id.</u> at p. 22.)

At no point during his plea hearing did Randolph indicate in any way that he did not understand the proceedings or the decision he was making. At no point did he indicate that he did not understand the wrongfulness of his actions or that his attorney had not fully investigated any issue. To the contrary, he stated that he wanted to plead guilty to Counts One and Thirty-Two because he was "in fact, guilty of those two Counts." (<u>Id.</u> at p. 21.) Importantly, despite given every opportunity to do so, Randolph never expressed any confusion whatsoever about his guilt, the punishment he faced, and the evidence against him. Randolph expressly agreed, under oath, with Agent Dulin's testimony describing Randolph's criminal conduct. (<u>Id.</u> at p. 24.)

Randolph also specifically testified that he and Mr. Phelps had looked over the Indictment together, discussed the law and facts of Randolph's case, gone through the plea agreement, and discussed the Sentencing Guidelines. (<u>Id.</u> at pp. 8–9.) When stating that he had no questions regarding the waiver of his rights, Randolph volunteered, "my attorney went over that with me." (<u>Id.</u> at p. 9.) Randolph affirmed that he was satisfied with Mr. Phelps'

representation and that he did not have any complaints about that representation whatsoever. (Id.)  Given this extensive colloquy and Randolph's sworn declarations, Randolph cannot now be heard to argue that his plea was not knowingly and voluntarily made.  Blackledge, 431 U.S. at 73–74.  Randolph's self-serving conclusory allegations regarding Mr. Phelps' performance prior to the plea agreement is thwarted by his own sworn testimony before this Court.

Further, Randolph testified that he read over the Plea Agreement, discussed it with his lawyer and then signed the agreement.  He agreed that he was not relying upon any promises outside of the Plea Agreement.  (Doc. 114, p. 19.)  In the Plea Agreement, Randolph agreed, among other things, to the factual basis of the charges against him and to his guilt of Counts One and Thirty Two.  (Doc. 88, pp. 2–4.)  He agreed that he would not be able to back out of his guilty plea if he received a sentence more severe than he expected.  (Id. at p. 5.)  Pertinently, Randolph agreed his complete satisfaction with Mr. Phelps' representation and he agreed that Mr. Phelps had rendered faithful, skillful, and diligent assistance.  (Id. at p. 9.)

It is patently absurd for Randolph to now seek to shirk his solemn declarations in his Rule 11 hearing and this plea agreement.  Randolph's knowing, voluntary, and intelligent plea bars his claims that Mr. Phelps rendered ineffective assistance prior to the entry of his guilty plea.  See Cruz v. United States, 188 F. App'x 908, 914 (11th Cir. 2006) (affirming dismissal of ineffective assistance claim where movant claimed counsel coerced her into pleading guilty based on misrepresented facts about the case and sentencing given the court's thorough explanation at plea hearing); United States v. Miley, 119 F. App'x 330, 332 (2d Cir. 2005) (holding that any prejudice from defense counsel's alleged misrepresentations was dispelled by the time movant pleaded guilty and acknowledged that no promises had, in fact, been made to him outside of the plea agreement).

Even if Randolph's guilty plea did not waive this claim, he has failed to demonstrate: (1) that Mr. Phelps' performance was deficient, i.e., the performance fell below an objective standard of reasonableness; or (2) that Randolph suffered prejudice as a result of that deficient performance. Strickland, 466 U.S. at 685–86. A Section 2255 movant asserting an ineffective assistance of counsel claim in the guilty plea process must establish that counsel's performance was deficient (i.e., professionally unreasonable) and that the deficient performance "affected the outcome of the plea process." Hill, 474 U.S. at 59. In other words, to establish prejudice, the movant "must show that there is a reasonable probability that, but for counsel's errors, he would . . . have pleaded [not] guilty and would . . . have insisted on going to trial." Id.; see also Slicker v. Wainwright, 809 F.2d 768 (11th Cir. 1987) (to be entitled to an evidentiary hearing on whether petitioner's lawyer incorrectly advised petitioner that the negotiated plea agreement provided that he would serve less time than the maximum penalty, petitioner was required to establish that he would not have pleaded nolo contendere and would have insisted on going to trial had his lawyer not misled him with faulty information).

Further, a mere allegation by a defendant that he would have insisted on going to trial but for counsel's errors, although required, is insufficient to establish prejudice. Rather, "the court must look to the totality of the objective factual circumstances surrounding the plea in order to determine whether there is a reasonable probability that the [movant] would in fact have insisted on trial." Suarez v. United States, No. 15-CR-20144, 2017 WL 3208725, at *5 (S.D. Fla. June 19, 2017), *report and recommendation adopted*, No. 16-24003-CIV, 2017 WL 3206328 (S.D. Fla. July 27, 2017) (citing Hill, 474 U.S. at 59; Hutchings v. United States, 618 F.3d 693, 697 (7th Cir. 2010)). This inquiry will often include an assessment of the strength of the

prosecution's case, any available defenses the movant could have asserted at trial, the plea colloquy, and the movant's potential sentencing exposure. Id.

Other than conclusory allegations that contradict his own sworn statements, Randolph has failed to allege that Mr. Phelps rendered defective assistance prior to the plea hearing. Randolph even contradicts himself in his Section 2255 Motion. On one hand, he claims that Mr. Phelps did not investigate exculpatory evidence. (Doc. 117, p. 2.) In the next breath, however, Randolph details Mr. Phelps' efforts to obtain an affidavit from Randolph's co-defendant, Edward Jennings. (Id.) In that affidavit, which Randolph attached to his Section 2255 Motion, Jennings takes the blame for the tax return scheme and indicates that Randolph had no knowledge of the fraudulent activities. (Id. at pp. 7–9.) Randolph also attached an affidavit which Phelps obtained from Talisha Fuller regarding Louis Johnson's involvement in the tax fraud scheme. (Id. at pp. 10–11.) Randolph also refers to "a report from the IRS after examining my computer/electronic devices for criminal activities." (Id. at p. 2.) However, Randolph fails to provide any factual description of this allegedly exculpatory evidence much less how Mr. Phelps rendered defective performance in regard to it. Thus, contrary to Randolph's conclusory allegation, it appears Mr. Phelps investigated and obtained whatever exculpatory evidence was available.

Randolph also takes issue with Mr. Phelps' advice that Randolph "did not stand a chance of winning the case." (Id. at p. 2.) However, Randolph has failed to demonstrate that this was faulty advice. According to Agent Dulin's testimony at the Rule 11 hearing, which Randolph agreed with under oath, the Government's investigation uncovered strong evidence of Randolph's guilt. (Doc. 114, pp. 22–25.) That investigation and evidence was further detailed in the PSI. (Doc. 116, ¶¶ 7–19.) Had Randolph proceeded to trial, he would have faced significant evidence of his guilt including:

- 371 tax returns prepared by Randolph that included "several suspicious items, including a large percentage of Schedule F (farming activity) losses and several instances of duplication of wage amounts and/or withholding amounts among the various returns," (id. at ¶¶ 9, 10);

- Randolph's use of an electronic filing identification number ("EFIN") assigned to a tax preparer who stated she does not know Randolph and did not give him access to her EFIN, (id. at ¶ 10);

- The testimony of several individuals for whom Randolph prepared tax returns who asserted that the returns included false information, (id. at ¶ 11);

- The testimony of several individuals for whom Randolph prepared and filed tax returns but who never met Randolph and never authorized him to prepare and file a return for them, (id. at ¶ 11);

- The testimony of one victim, Mr. Spaulding, in whose name a tax return was filed from an IP Address assigned to Randolph without any knowledge of Mr. Spaulding. The refund check generated from this return was mailed to an address used by Randolph, and Randolph endorsed the back of the check in order for it to be cashed, (id. at ¶¶ 12, 13);

- The testimony of the owners of the Country Store in Jesup, Georgia, who asserted that Randolph routinely brought individuals to the store to cash tax refund checks. The check holders often did not have proper identification, and, thus, Randolph vouched for the check holders and cosigned the checks as a second endorser, (id. at ¶ 13);

- Evidence from the investigation that "revealed that Randolph accompanied a different individual to Country Corner Store to cash each of the checks set forth in Counts 22 through 30 and Counts 32 through 40 of the Superseding Indictment. On each occasion, Randolph vouched for the identity of the individual cashing the check and signed the check as a second endorser," (id.);

- The testimony from another victim, Richard Merritt, indicating that Randolph fraudulently prepared and filed a tax return without Merritt's knowledge and evidence that the check generated from that return was endorsed and cashed by Randolph, (id. at ¶¶ 14, 15);

- Evidence gathered by Agent Dulin that "a total of at least 35 income tax returns filed by Randolph during tax years 2010, 2011, and 2012, using stolen [Personal Identifying Information ("PII")]. The 35 fraudulent tax returns involved the stolen PII from at least 26 unique victims. The 35 fraudulent tax returns claimed refunds totaling $320,496. Due to suspicious indicators detected by the IRS, several of the claims were flagged as potential fraud and not paid. As a result, the IRS paid $283,456.52 due to fraudulent tax returns submitted by Randolph," (id. at ¶ 19).

All that Randolph offers to contradict this mountain of evidence are the affidavits of Jennings and Fuller and an audiotape of Jennings' confession. (Doc. 117, pp. 2–3, 7–11.) Ms. Fuller's statement does not contain any information regarding Randolph much less any outright exculpatory information. (Id. at pp. 10–11.) Moreover, according to Randolph, Jennings had a sordid criminal history and is a well-known drug seller and user. (Id. at pp. 2–3.) Further, Randolph acknowledges that Jennings recanted the story from his affidavit and offered

information against Randolph.  (Id.)  Indeed, prior to Randolph entering a plea agreement, Jennings entered a plea agreement wherein he admitted that he participated in the criminal conspiracy with Randolph.  (Doc. 85.)  In that agreement, Jennings agreed to cooperate with the Government regarding Jennings' and Randolph's crimes.  (Id. at p. 6.)  As part of that cooperation, Jennings agreed to provide the Government with "statement(s)/affidavit(s) provided by Defendant Jennings to Defendant Randolph's counsel, which Defendant Jennings indicates includes certain information that he knew to be false when provided to Defendant Randolph's counsel."  (Id. at p. 6, n.1.)  For all of these reasons, the material from Jennings and Fuller is not the "smoking gun" of exoneration evidence that Randolph makes it out to be.

In sum, the Government would have presented the jury with significant evidence of Randolph's guilt, and the only evidence that Randolph contends Mr. Phelps could have used to rebut the Government's case is a statement from a codefendant that actually would have testified to Randolph's guilt.  Consequently, it was quite reasonable for Mr. Phelps to advise Randolph of his dismal chances at trial.  United States v. Hall, No. CIV.A. 09-00319, 2011 WL 4101504, at *3 (S.D. Ala. Sept. 13, 2011) (rejecting 2255 movant's conclusory claim that counsel rendered ineffective assistance by advising him that he had "no chance of winning" at trial because, among other reasons, movant failed to demonstrate that advice was erroneous); see also Doyle v. Jones, 452 Fed. App'x 836, 841–42 (10th Cir. 2011) (defendant failed to demonstrate counsel was ineffective for giving an unrealistic assessment of the case where defendant failed to demonstrate either that counsel misadvised him on the relative merits of his options, or that counsel's performance was professionally unreasonable); Dickison v. Jones, No. 3:13CV590/LC/CJK, 2016 WL 908864, at *6 (N.D. Fla. Feb. 8, 2016) (to state a legally sufficient claim on grounds for advice on chances of success at trial, movant must prove some

specific deficiency such as counsel's assessment was unreasonable under the circumstances or that counsel had not investigated or otherwise was not familiar with the case), *report and recommendation adopted*, 2016 WL 901686 (N.D. Fla. Mar. 9, 2016).

Moreover, even if Phelps' pre-plea investigation and advice were deficient, Randolph offers nothing more than his own self-serving allegation that he would have gone to trial but for Phelps' alleged errors. This bare assertion is not sufficient to show prejudice. Moreover, the "totality of the objective factual circumstances" rebuts Randolph's conclusory claim. Suarez, 2017 WL 3208725, at *5. As outlined above, the Government's case against Randolph was strong and included the investigation described by Agent Dulin and the PSI as well as codefendant Jennings' cooperation against Randolph. Even now, Randolph provides no credible defense to the Government's case.

Moreover, Randolph significantly reduced his sentencing exposure by pleading guilty. He only pleaded guilty to the conspiracy count and to one of the twenty aggravated identity theft counts levied against him. (Doc. 88.) In exchange, the Government agreed to dismiss the remaining counts of the Superseding Indictment. (Id.) If Randolph had gone to trial and been found guilty of the other nineteen aggravated identify theft counts, he faced the prospect of consecutive two-year sentences of imprisonment for each of those counts. By statute, a conviction for aggravated identity theft requires a sentence of twenty-four months, which must run consecutively to any other term of imprisonment imposed by the court at the same time. 18 U.S.C. § 1028A(b). The only exception to this statutory mandate of consecutive sentences grants sentencing courts the discretion to run additional Section 1028A sentences imposed at the same time concurrently with each other. 18 U.S.C.A. § 1028A(b)(4) ("a term of imprisonment imposed on a person for a violation of this section may, in the discretion of the court, run

concurrently, in whole or in part, only with another term of imprisonment that is imposed by the court at the same time on that person for an additional violation of this section . . . ."). The sentencing judge must exercise that discretion "in accordance with any applicable guidelines and policy statements issued by the Sentencing Commission." Id.

The Sentencing Guidelines contain a non-exclusive list of factors that sentencing courts consider when determining whether to run additional Section 1028A sentences concurrently with or consecutively to each other. U.S.S.G. § 5G1.2 cmt. n.2(B). These factors include the "nature and seriousness of the underlying offenses," the groupability of the offenses under Section 3D1.2, and whether "the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) are better achieved by imposing a concurrent or a consecutive sentence." Id. However, as long as the sentencing judge considers these factors, consecutive Section 1028A sentences will be upheld on appeal. See, e.g., United States v. Lee, 545 F.3d 678, 681 (8th Cir. 2008) (upholding district court's decision to run three of defendant's five Section 1028A aggravated identify theft sentences consecutively where court adequately explained its reasoning for imposing consecutive sentences). Thus, if Randolph had proceeded to trial and been found guilty of the other nineteen aggravated identify theft counts pending against him, he faced the very real possibility of an additional thirty-eight years in prison on those counts. In light of this fact and the other circumstances surrounding Randolph's plea, Randolph has failed to show that but for Mr. Phelps' alleged errors he would have "rationally" insisted on going to trial. Padilla v. Kentucky, 559 U.S. 356, 372 (2010) (citation omitted). As such, he cannot meet the prejudice prong of his pre-plea ineffective assistance claims.

For all of these reasons, the Court should **DENY** Randolph's claims that Mr. Phelps rendered ineffective assistance of counsel leading up to Randolph's guilty plea.

## II.     Mr. Phelps' Assistance at Sentencing Regarding Acceptance of Responsibility.

Randolph also claims that "Mr. Phelps failed to argue and present evidence that I had indeed accepted my responsibility for a sentence reduction at the sentencing proceeding." (Doc. 117, p. 5.) This claim is easily refuted by the fact that Phelps repeatedly argued throughout the sentencing phase that Randolph should receive a reduction based on his acceptance of responsibility and presented evidence in support of that argument. First, Phelps objected to the Probation Officer's recommendation that Phelps not receive a reduction in his offense level. (Doc. 116, p. 21.) In his Sentencing Memorandum, Phelps reiterated this objection. (Doc. 96.) He also contended that Randolph should receive a sentence below the Guidelines due to his cooperation prior to the Indictment and attached the IRS report regarding Randolph's interview with investigators. (Id.) Then, at the sentencing hearing, Mr. Phelps once again argued that Randolph should receive a reduction in his offense level for his acceptance of responsibility. (Doc. 110, pp. 4, 28–29.) Mr. Phelps highlighted Randolph's cooperation and acceptance of responsibility as one of his primary arguments in mitigation of the sentence. (Id.) While those efforts were ultimately unavailing, Randolph's contention that Mr. Phelps did not make any argument or present any evidence on this front is plainly wrong.

Even if Mr. Phelps had not argued for Randolph to receive a downward departure for acceptance of responsibility, Randolph could not establish either prong of an ineffective assistance claim. The Sentencing Guidelines permits a two-level reduction in offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1 (a). However, a defendant who pleads guilty does not automatically receive a reduction for acceptance of responsibility as a matter of right. Rather, the guidelines state that evidence of a defendant's truthful admission of his criminal conduct "may be outweighed by conduct of the

defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n.3. The court must consider such factors as the defendant's "voluntary termination or withdrawal from criminal conduct or associations." U.S.S.G. § 3E1.1 cmt. n.1(b).

In this case, Randolph's conduct while on bond was inconsistent with acceptance of responsibility and it outweighed his admission and cooperation. As laid out above, on April 7, 2015, the Court revoked Randolph's bond because he violated his conditions of his pre-trial release by maintaining a position of trust, maintaining access to personal identifiers, preparing tax returns, acting as a tax advisor, and preparing at least one fraudulent tax return. (Doc. 70; Doc. 116, ¶ 5.) On that basis, the probation officer recommended that the Court deny Randolph a reduction for acceptance of responsibility under Section 3E1.1, and Judge Wood concurred with that recommendation. (Doc. 116, ¶ 23; Doc. 110, pp. 6–7.) Thus, Randolph's own conduct, not any error by Mr. Phelps, resulted in Randolph not receiving a sentence reduction for acceptance of responsibility.

**III.   Mr. Phelps' Decision to Not Present Jennings and Fuller's Statements at Sentencing.**

Randolph also complains that Mr. Phelps did not present Jennings and Fuller's affidavits and Jennings' recorded statement when asked for mitigating evidence at the sentencing hearing. (Doc. 117, p. 3 ("Mr. Phelps having sworn affidavits and audio tape stating that I had no involvement with the crimes, Mr. Phelps refused to present them to the court when asked by the judge at the sentencing proceeding if he had any evidence or argument in mitigation of sentence."); see also Doc. 128, pp. 1–2.) This claim is illogical and misconstrues the concept of mitigating evidence.[5]

---

[5] Randolph cites <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), in support of this claim. (Doc. 117, p. 3.) However, <u>Brady</u> pertains to the Government's withholding of exculpatory information that is material to the guilt or punishment of a criminal defendant, and has nothing to do with a defendant's attorney's decision as to what available evidence to introduce. Randolph does not assert a coherent <u>Brady</u> claim in

Randolph apparently contends that Mr. Phelps should have used Jennings and Fuller's statements at the sentencing hearing to argue that Randolph was innocent and that Jennings was solely culpable for the crimes. This would have been an ill-advised strategy to say the least. Well before the sentencing hearing, Randolph admitted to his guilt at the Rule 11 hearing. It would have been inane for Mr. Phelps to impeach his own client's guilty plea at the sentencing hearing with supposedly exculpatory evidence. This is particularly true given the fact that Mr. Phelps argued that Judge Wood should reduce Randolph's offense level due to his acceptance of responsibility. Indeed, as discussed above, Randolph continues to press his acceptance of responsibility in his Section 2255 Motion. Mr. Phelps could not have argued on one hand that the Court should reduce Randolph's sentence because he had admitted his guilt and accepted responsibility for his crimes while on the other hand offering evidence and argument that Randolph was not guilty of those crimes. Moreover, Judge Wood sentenced Jennings prior to Randolph and was, therefore, well aware of Jennings' conduct, admissions, criminal history, and involvement in the conspiracy. (Doc. 95.) Randolph fails to explain how Jennings and Fuller's statements could have helped his case at sentencing.

Moreover, even if Jennings and Fuller's statements were somehow relevant to any issue at sentencing, Mr. Phelps made a sound strategy decision not to introduce this evidence. As noted above, Fuller's affidavit does not actually contain any exculpatory information, and Jennings' affidavit and statement are fraught with issues of impeachment. Decisions as to which witnesses to call and evidence to offer are "quintessential trial strategy" decisions that are left to

his Motion. While he refers to the IRS's review of his computer, he does not explain what information was supposedly withheld much less how it falls under Brady. "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999). Randolph has not made a sufficient showing as to any of these components.

counsel and should ordinarily not be second guessed. <u>Ball v. United States</u>, 271 F. App'x 880, 884 (11th Cir. 2008) (citing <u>Chandler</u>, 218 F.3d at 1314 n.14 (decision to call some witnesses and not others is "the epitome of a strategic decision")) (quotation marks omitted); <u>Blanco v. Singletary</u>, 943 F.2d 1477, 1495 (11th Cir.1991) ("The decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel."); <u>see also</u> <u>Wilson v. Greene</u>, 155 F.3d 396, 404 (4th Cir. 1998) ("Decisions about what types of evidence to introduce are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what sort of mitigating evidence they can choose not to introduce." (citation omitted)); <u>United States v. Ferguson</u>, No. 04-CR-177-GKF, 2008 WL 5205651, at *4 (N.D. Okla. Dec. 11, 2008) ("Counsel's decision not to introduce into evidence the affidavit of [an affiant during the sentencing hearing] may be viewed as sound trial strategy because the reliability and credibility of the affidavit was subject to attack. 'Strategic decisions of trial counsel are ordinarily shielded from charges of ineffectiveness. Tactical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance.'" (quoting <u>United States v. Murphy</u>, 156 Fed. App'x 90, 93 (10th Cir. 2005))).

For all of these reasons, the Court should **DENY** Randolph's claim that Mr. Phelps rendered ineffective assistance by failing to introduce Jennings' affidavit and statement and Fuller's affidavit at the sentencing hearing.

## IV. Mr. Phelps' Decisions Regarding Witnesses at the Sentencing Hearing.

Lastly, Randolph complains that "Mr. Phelps refused to allow character witnesses such as a lawyer, court bailer and psychologist to testify on my behalf. He only allowed witnesses that could testify and raise issues concerning my criminal records." (Doc 117, p. 5.) Again, decisions regarding what witnesses to call are classic strategy decisions that should ordinarily be

entrusted to the judgment of counsel. <u>Ball</u>, 271 F. App'x at 884; <u>Chandler</u>, 218 F.3d at 1314 n.14; <u>Blanco</u>, 943 F.2d at 1495. Moreover, Randolph has failed to demonstrate that Mr. Phelps' decisions regarding what witnesses to call at the sentencing hearing fell "outside the wide range of reasonable professional assistance." <u>LeCroy</u>, 739 F.3d at 1312. Further he has failed to demonstrate what prejudice he suffered from Mr. Phelps' decisions on this front.

While Randolph baldly contends that a "lawyer, court bailer, and psychologist" could have testified on his behalf, he offers no information whatsoever about the testimony these witnesses would have offered. Indeed, he only identifies one of these witnesses, the lawyer Mr. Alvin Leaphart. (Doc. 117, p. 5.) Ironically, the case Randolph cites to for Mr. Leaphart's credentials, <u>Burger v. Kemp</u>, 483 U.S. 776 (1987), actually cuts against Randolph's claim that Mr. Phelps rendered ineffective assistance. In <u>Burger</u>, the United States Supreme Court affirmed the denial of a habeas petitioner's claim that Leaphart rendered ineffective assistance of counsel to a criminal defendant. 484 U.S. at 794–95. One of the claims the Supreme Court rejected was the petitioner's allegation that Leaphart presented insufficient mitigation evidence at the sentencing hearing. <u>Burger</u>, 484 U.S. at 789–94. The evidence that Leaphart declined to introduce included the testimony of a lawyer and a psychologist as well as several affidavits. <u>Id.</u> The Court found Leaphart's decisions regarding these witnesses and evidence were strategy calls within the range of competent assistance. <u>Id.</u> Similar to Mr. Leaphart in <u>Burger</u>, in this case Mr. Phelps' made a reasonable strategic decision to not call certain witnesses Randolph contends were prepared to testify on his behalf. Randolph has failed to demonstrate that Phelps' decision was unreasonable or that he was prejudiced by it.

Likewise, the Court cannot retrospectively nitpick Mr. Phelps' decisions regarding the witnesses that he did call at the sentencing hearing. In the sentencing memorandum and at the

sentencing hearing, Mr. Phelps employed a five-pronged strategy to obtain a lesser sentence for Randolph. (Doc. 96, pp. 1–5.) This strategy focused on the positive aspects of Randolph's past including the financial and emotional support he provided his family as well as his good works in the community. Randolph largely echoed that strategy in his statement of allocution at the sentencing hearing. (Doc. 110, pp. 31–36.) In order to provide factual support for the strategy, Mr. Phelps needed to introduce evidence from those who knew Randolph well. Thus, Mr. Phelps elicited testimony from Randolph's fiancée, his uncle who is his pastor, his fiancée's mother, and a longtime friend who is a military veteran. (Doc. 110, pp. 8–26.) This strategy was effective as Judge Wood stated, "Mr. Phelps has done a good job of bringing forth members of your family and your community and eliciting from you statements about the good side, and that's important in the sentencing." (Id. at p. 37.)

Randolph points out that, because these witnesses knew him well, Judge Wood and AUSA Nokes asked the witnesses questions about his criminal background. (Doc. 117, p. 5.) However, any witness that knew Randolph well enough to credibly testify as to the positive aspects of his background would also know about the negative aspects of that background. Mr. Phelps could not change the fact Randolph had been convicted of family violence battery for striking the mother of his children and causing her visible injuries as well as battery of another woman. Nor could Mr. Phelps hide that past from the Court. The Court was well aware of these convictions before sentencing as they were listed in the PSI. (Doc. 116, ¶¶ 43, 44.) Even Randolph addressed these convictions during his allocution at the sentencing hearing. (Doc. 110, p. 34.) Thus, the Court knew of Randolph's criminal background not because of any error by Mr. Phelps but because of Randolph's prior actions. As such, Randolph cannot show that Mr.

Phelps' strategy decision to call the four witnesses that he called fell outside the range of competent counsel or that the decision prejudiced him in any way.

For all of these reasons, the Court should **DENY** Randolph's claim that Mr. Phelps rendered ineffective assistance of counsel in his decisions as to what witnesses to call at the sentencing hearing.

## V.    Leave to Appeal *in Forma Pauperis* and Certificate of Appealability

The Court should also deny Randolph leave to appeal *in forma pauperis* and a Certificate of Appealability. Though Randolph has, of course, not yet filed a notice of appeal, it is proper to address these issues in the Court's order of dismissal. Pursuant to Rule 11 of the Rules Governing Section 2255 Cases, "the district court <u>must</u> issue or deny a certificate of appealability when it issues a final order adverse to the applicant." (Emphasis supplied); <u>see also</u> Fed. R. App. P. 24(a)(3) (trial court may certify that appeal of party proceeding *in forma pauperis* is not taken in good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies that the appeal is not taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3). Good faith in this context must be judged by an objective standard. <u>Busch v. Cty. of Volusia</u>, 189 F.R.D. 687, 691 (M.D. Fla. 1999). A party does not proceed in good faith when he seeks to advance a frivolous claim or argument. <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 445 (1962). A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless. <u>Neitzke v. Randolph</u>, 490 U.S. 319, 327 (1989); <u>Carroll v. Gross</u>, 984 F.2d 392, 393 (11th Cir. 1993). Stated another way, an *in forma pauperis* action is frivolous, and thus, not brought in good faith, if it is "without arguable merit either in law or

fact." <u>Napier v. Preslicka</u>, 314 F.3d 528, 531 (11th Cir. 2002); <u>see also</u> <u>Brown v. United States</u>, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Additionally, under 28 U.S.C. § 2253(c)(1), an appeal cannot be taken from a final order in a habeas proceeding unless a certificate of appealability is issued. A certificate of appealability may issue only if the applicant makes a substantial showing of a denial of a constitutional right. The decision to issue a certificate of appealability requires "an overview of the claims in the habeas petition and a general assessment of their merits." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003). In order to obtain a certificate of appealability, a petitioner must show "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Id.</u> "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000); <u>see also</u> <u>Franklin v. Hightower</u>, 215 F.3d 1196, 1199 (11th Cir. 2000). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." <u>Miller-El</u>, 537 U.S. at 336.

Based on the above analysis of Randolph' pleadings and the Government's Response and applying the Certificate of Appealability standards set forth above, there are no discernable issues worthy of a certificate of appeal; therefore, the Court should **DENY** the issuance of a Certificate of Appealability. If the Court adopts this recommendation and denies Randolph a Certificate of Appealability, Randolph is advised that he "may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." Rule 11(a), Rules Governing Section 2255 Cases in the United States District Courts. Furthermore, as

there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith. Thus, the Court should likewise **DENY** Randolph *in forma pauperis* status on appeal.

## CONCLUSION

For the above-stated reasons, I **RECOMMEND** this Court **DENY** Randolph's Motion to Vacate, Set Aside, or Correct his Sentence. (Doc. 117.) Additionally, the Court should **DENY** Randolph a Certificate of Appealability and *in forma pauperis* status on appeal. Further, I **RECOMMEND** that the Court **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within **fourteen (14) days** of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the pleading must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United

States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge.

The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon Randolph and Respondent.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 27th day of February, 2018.

_____
R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA